UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI CIVIL DIVISION

CASE NO.: ____:20-cv-_____-_____

**KEY WEST BAR PILOTS ASSOCIATION,**

        Plaintiff,

**v.**

**R. JOYCE GRIFFIN,** in her official capacity as **SUPERVISOR OF ELECTIONS FOR MONROE COUNTY, FLORIDA,** the **CITY OF KEY WEST,** a municipal corporation of the State of Florida, and **KEY WEST COMMITTEE FOR SAFER CLEANER SHIPS, INC.,** a Florida non-profit corporation

        Defendants.

_____/

### KEY WEST BAR PILOTS ASSOCIATION'S COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Key West Bar Pilots Association (hereinafter "Pilots" or "Plaintiff"), by and through undersigned counsel, hereby sues R. Joyce Griffin, in her official capacity as Supervisor of Elections for Monroe County, Florida ("Supervisor Griffin"), the City of Key West, a municipal corporation of the state of Florida ("City"), and Key West Committee for Safer Cleaner Ships, Inc., a Florida non-profit corporation (the "Committee") for a Declaratory Judgment ("Complaint") which will determine whether or not the Committee's three proposed charter amendments will appear on the November 3, 2020 ballot, and states as follows:

{00200804 - v6 }

## GENERAL ALLEGATIONS

*Jurisdiction, Parties, and Venue*

1. This is a pre-ballot action for declaratory relief in connection with three proposed charter amendments dealing with cruise ships in Key West, the facial legality of which is in violation of, *inter alia*, the United States Constitution.

2. Plaintiff Pilots are a common law partnership with a principal place of business in Monroe County, Florida, formed by four separate legal entities, each consisting of one (1) harbor pilot who lives and works in Monroe County, Florida.

3. Defendant Supervisor Griffin is the Supervisor of Elections for Monroe County, Florida, and acts pursuant to the authority vested in her by Article VIII, § 1(d) of the Florida Constitution and § 98.015, Florida Statutes.

4. Defendant City is a municipal corporation of the state of Florida located in Monroe County, Florida, operating pursuant to a municipal charter.

5. Defendant Committee is a not-for-profit corporation, with a main office and a principal place of business in Monroe County, Florida, that is the proponent of the three City charter amendments at issue.

6. This Court has subject matter jurisdiction pursuant to U.S. Const. art VI, cl. 2, 46 U.S.C. § 41006, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

7. Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391.

8. This action arises from a pre-ballot challenge to an election in Monroe County, Florida and, pursuant to Rule 3.1, Local Rules for the Southern District of Florida; the Key West Division is the proper forum.

### *History of the Harbor Pilots and the Port of Key West*

9. Harbor pilots are highly-trained and skilled state-licensed professional mariners that take control of US-flagged and foreign-flagged cargo and cruise ships and direct the movement of those ships into and out of the deepwater ports in Florida.

10. To be a Florida state-licensed harbor pilot, you must at a minimum (1) have extensive maritime experience satisfactory to the Board of Pilot Commissioners; (2) pass and score the highest grade out of all candidates on a comprehensive deputy pilot exam which includes drawing all nautical charts from memory; (3) serve a two and a half year apprenticeship with a licensed state harbor pilot; (4) be approved after a practical observation by a state licensing board; and (5) pass an additional state pilot exam.

11. Harbor pilots are subject to extensive regulation under Chapter 310, Florida Statutes. The Florida Legislature has recognized the importance to the state's economy of the essential service that harbor pilots provide. "Piloting is an essential service of such paramount importance that its continued existence <u>must be secured by the state and may not be left open to market forces.</u>" Fla. Stat. § 310.0015(1) (emphasis supplied).

12. The Pilots are the four (4) harbor pilots that service the Port of Key West.

13. The first licensed harbor pilot in Florida was Captain John H. Geiger; Captain Geiger came to Key West in 1823 and served as the pilot for Commodore Porter's anti-piracy squadron.

14. After Commodore Porter left Key West, Captain Geiger stayed and continued piloting vessels in the Port of Key West, in addition to becoming the very first licensed pilot in the state in 1829, Captain Geiger was also a famous "wrecker" in Key West.

15. Harbor pilots, later associating as the Pilots, continued to serve the maritime interests of Key West over the years.

16. During World War II, Key West was the staging area for convoys that left from the United States to Europe, with thousands of cargo ships going in and out of the Port of Key West. Numerous additional pilots came to Key West from other ports to support that vital mission.

17. In 1969, the first scheduled cruise ship (the Sunward) came to Key West.

18. Between 1969 and 1984, cruise ships, assisted by the Pilots, continued to visit Key West on regularly scheduled visits, coming to the two major docks that were available; the Navy's Mole and the Pier B dock.

19. In 1984, the City made improvements to the dock at Mallory Square to allow it to accept cruise ships.

### *The Current State of the Pilots and the Port of Key West*

20. Florida currently has fifteen public seaports that generate 900,000 jobs and contribute $117.6 billion to Florida' economy. Florida's maritime activities account for approximately 13% of Florida's GDP.

21. The Port of Key West is one of the busiest cruise ports of call in the nation; just under one million people visit Key West annually through the Port of Key West, and it provides an

economic impact of approximately $85 million and 1,250 jobs and 15% of the City's total tax revenue.

22. The three docking facilities at the Port of Key West are the City-owned Mallory Square, the Navy's Outer Mole, and the privately-owned Pier B.

23. The amount of activity, prior to the recent Covid-19 slowdown, has necessitated that the Pilots have four harbor pilots and two pilot boats to ensure that state of Florida requirements are fulfilled for safe and timely passage.

24. The continued presence of cruise ships is not just imperative for the City's tax revenues, for the jobs of over 1,000 citizens of Key West, and the economy of Monroe County, but is also particularly important to the Pilots' continued economic well-being.  The loss of the cruise ships, as further detailed below, would be a death-knell to the 200-year history of Pilots serving the Port of Key West and functionally sever Key West's citizens from a working maritime heritage and future.

25. The passage of the Initiatives would result in a severe pecuniary loss to the Pilots, and the Pilots being unable to maintain dependable piloting operations in the Port of Key West pursuant to Fla. Stat. § 310.0015(c).

### *Three Amendments Designed to Unlawfully End the Cruise Industry*

26. On or about May 1, 2020, the Committee was registered with the Florida Department of State, Division of Corporations.

27. The Committee promulgated three (3) petition initiatives to amend the charter of Key West.

{00200804 - v6 }

28. The first initiative, to add a new § 1.09 to the City Charter of Key West was titled, "Limiting Persons disembarking from cruise ships to a total of 1,500 persons per day" and had the following text:

> The number of persons disembarking from cruise ships shall be limited to a total of not more than 1,500 persons per day at any and all public and privately owned or leased property located within the municipal boundary of the City of Key West.

A true and correct copy of this initiative, text, and affidavit submitted by the Committee to the City is attached hereto as Exhibit A and will be referred to as "Initiative 1."

29. The second initiative, to add a new § 1.10 to the City Charter of Key West was titled, "Prohibiting cruise ships with a capacity of 1,300 or more persons from disembarking" and had the following text:

> Cruise ships with the capacity to carry 1,300 or more persons (passengers and crew) shall be prohibited from disembarking individuals at any and all public or privately owned or leased property located within the municipal boundary of the City of Key West.

A true and correct copy of this initiative, text, and affidavit submitted by the Committee to the City is attached hereto as Exhibit B and will be referred to as "Initiative 2."

30. The third initiative, to add a new § 1.11 to the City Charter of Key West was titled, "To give priority to cruise lines with the best environmental and health records" and had the following text:

> The City of Key West shall give preference and priority to cruise ships and cruise lines that have the best environmental record (the lowest number of environmental violations, penalties and fines) and best health record (the best scores and least number of violations in health inspections and reports issued by the Center of Disease Control Vessel Sanitation Program).

A true and correct copy of this initiative, text, and affidavit submitted by the Committee to the City is attached hereto as Exhibit C and will be referred to as "Initiative 3." Collectively the three initiatives to amend the City Charter of Key West will be referred to as the "Initiatives."

31. On May 7, 2020, Evan Haskell, Julian Benson, Arlo Haskell, David Dunn, and Roger McVeigh, as officers and members of the Committee, began the process of putting the initiatives on the ballot by submission of affidavits to city. *See* Exhibits A-C.

32. As of June 4, 2020, Supervisor Griffin had officially certified that the petitions were signed by the requisite number of voters, making the Initiatives eligible for the ballot.

33. On June 4, 2020, the Clerk's Office of the City of Key West ruled that the Initiatives would be placed on the November 3, 2020 general election ballot.

### *The Pilots are Harmed by Allowing the Initiatives to go Forward*

34. As further detailed below, Pilots know that the Initiatives, even should they succeed at the ballot box, will fail after litigation as there is no possible saving construction given that the Initiatives are unlawful under federal law, state law, and local law.

35. However, the unprecedented economic impact of Covid-19 has decimated the local economy of Key West as well as the maritime industry of Key West. In addition, cruise ships and cruise lines have cancelled North American cruises through September 30, 2020.

36. The impact of the Initiatives would be the effective end of cruise ships coming to Key West; Initiatives 1 and 2 regulating the size of cruise ships and the number of people allowed to disembark would effectively end the ability of cruise ships to visit the Port of

Key West, as no modern cruise ships meet those standards, and the few, small cruise ships (effectively, large-scale yachts that operate as cruise ships) rarely come to Key West and due to their size lack the ability to have modern pollution controls and on-board waste treatment systems necessary to meet Initiative 3.

37. The four highly-trained harbor pilots that make up the Pilots have spent significant sums and time on their training, and are weathering the Covid-19 storm as best they can. However, the Pilots are suffering continuing losses and pecuniary harm given the uncertainty over the Initiatives that will last at least through November 3, 2020.

38. Waiting until November 3, 2020, and possibly months afterwards will cause irreparable economic harm to the Pilots.

39. These allegations demonstrate a bona fide, actual, present practical need for the declaration of the Court as to the Initiatives.

40. The declaration sought deals with the present, ascertained and ascertainable state of facts in relation to the parties and the present controversy as to the state of facts.

41. The relief sought by the Pilots is not merely the giving of legal advice or due to simple curiosity but is a controversy that is substantial and concrete, touches the legal relations of parties with adverse interests, and will find specific relief through a decree by this Court of conclusive character.

### *History of Federal Regulation and Maritime Preemption*

42. The primacy of the federal government in issues related to admiralty, maritime, and the ports and commerce of the United States is unquestioned.

43. The United States Constitution was written with numerous provisions specifically related to federal supremacy regarding maritime commerce, including a prohibition on state discrimination against cargo shipments (the Tonnage clause) and vesting admiralty jurisdiction with federal courts (the Admiralty clause).

44. Congress enacted the first legislation to set federal vessel standards shortly after the Constitution was ratified in 1789, and that federal registration was arguably the first systemic federal legislative statutory scheme.

45. The importance, and primacy, of federal regulation of maritime commerce is such that one of the earliest federal courthouses in Florida, and the first in the Southern District, the Old Post Office and Customs House, was built in Key West in 1891 primarily to adjudicate federal claims regarding maritime salvage.

46. Federal law, and federal courts, have long recognized the primacy of federal regulation over state regulation when it comes to local and state attempts to regulate the maritime industry due to federal primacy and/or the commerce clause; *Gibbons v. Ogden*, 22 U.S. 1 (1824) (invalidating state attempts to regulate steamboats); *Sinnot v. Davenport*, 63 U.S. 227 (1859) (invalidating state statute requiring names of passengers to be recorded, as only Congress can regulate ships and vessels); *Foster v. Davenport*, 63 U.S. 244 (1859) (extending *Sinnot* to say that only Congress can regulate domestic ships and vessels); *Moran v. City of New Orleans*, 112 U.S. 69, 75 (1884) (striking down state law authorizing City's enactment of a license fee on ships as a burden on commerce).

47. In 1916, Congress passed the Merchant Marine Act of 1916 (sometimes referred to as the "Alexander Act") creating another comprehensive system of regulation for commercial

vessels. Later, as amended, this would be referred to as the Shipping Act of 1916 and codified at 46 U.S.C. §§ 801 *et seq*.

48. A major overhaul of this comprehensive and preclusive federal regulation of shipping occurred in 1984, with the passage of the U.S. Shipping Act, later amended in 1998.

49. Finally, Title 46, the comprehensive federal regulation of shipping, recently incorporated the Ports and Waterways Safety Act of 1972, 33 U.S.C. § 1221 *et. seq.* (the "PWSA"). *See* Chap. 700, 46 U.S.C. ("Ports and Waterway Safety").

50. The overall federal regulatory scheme of Title 46 has also repeatedly been held to preempt state and local regulations of shipping. *See, e.g., Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 168 (1978) (finding field preemption under Title 46); *accord United States v. Locke*, 529 U.S. 89 (2000) (explaining history of preemption).

### *State Regulation and Maritime Preemption*

51. While the federal government is supreme in matters regarding maritime commerce, the state of Florida has additionally preempted local governments, such as the City, from regulating the maritime industry.

52. The Florida Legislature adopted two pertinent economic policies for Florida; to (1) "[e]ncourage the development of a business climate that provides opportunities for the growth and expansion of existing state industries, particularly those industries which are compatible with Florida's environment[,]" and (2) "[p]romote coordination among Florida's ports to increase their utilization." Fla. Stat. § 187.201.

53. Pursuant to those policies, the Legislature enacted the Florida Transportation Plan with long-range transportation goals and objectives "based upon the prevailing principles of:

{00200804 - v6 }

(a) [p]reserving the existing transportation infrastructure[;] (b) [e]nhancing Florida's economic competitiveness[;] (c) [i]mproving travel choices to ensure mobility[;]" and "(d) [e]xpanding the state's role as a hub for trade and investment." Fla. Stat. § 339.155.

54. In order to achieve these goals, the Legislature created the Florida Seaport Transportation and Economic Council to prepare plans for the state's seaports, such as the Port of Key West, that are consistent with the Florida transportation plan.  Fla. Stat. § 311.09.

55. Each Florida port must develop a strategic plan which includes: "(a) [a]n economic development component that identifies targeted business opportunities for increasing business and attracting new business for which a particular facility has a strategic advantage over its competitors, . . . encourage growth of existing business and acquisition of new business . . . (b) [a]n infrastructure development and improvement component . . . in order for a port to attain a strategic advantage for competition with national and international competitors."  Fla. Stat. § 311.14.

56. To the limited extent that the state of Florida may regulate maritime commerce, such as by regulating Florida's port facilities, the Legislature has created a comprehensive strategic plan that does not allow local municipalities to override the Legislature in a manner inconsistent with Florida's transportation plan.

### *The Initiatives are Unlawful Comprehensive Plan Amendments*

57. In 1985, growth management legislation was passed that provides for local government "comprehensive plans."  These local planning and land use decisions (comprehensive plans) are codified at Fla. Stat. § 163.3177.

58. Monroe County and the City have Comprehensive Plans. Both Monroe County and the City have comprehensive plans that specifically mention the Port of Key West, and provide for the regulation of growth of the Port of Key West and cruise ships.

59. Monroe County's Comprehensive Plan, Goal 502, states that Monroe County shall be served with ports in a manner that maximizes economic benefit; more specifically, Objective 502.1 provides that "[b]ecause of the Florida Keys' unique nature as an archipelago, Monroe County shall promote the preservation and enhancement of the existing ports and port related activities."

60. Policy 502.1.1 provides that Monroe County shall maintain land development regulations and the Land Use District Maps for existing ports which permit ports and port-related facilities. Policy 502.1.3 provides that Monroe County shall facilitate port facilities that relieve traffic on U.S. 1.

61. Finally, Objective 502.4 requires that Monroe County coordinate all port or related facilities with the plans of the U.S. Army Corps of Engineers; the Resource Planning and Management Program which was prepared pursuant to Chapter 380, Florida Statutes and approved by the Governor and Cabinet; and Florida's Department of Transportation's District Six Five-Year Transportation Plan as adopted. Moreover, Policy 502.4.2 requires Monroe County to coordinate port-related developments with the Key West Department of Transportation.

62. The sum total of Monroe County's comprehensive plan is that Monroe County has an interest in the Port of Key West that is codified in its comprehensive plan; an interest that cannot be abrogated through amending the City's charter.

63. The City's provisions are more explicit: Goal 5A-1 of the City's Comprehensive Plan states that the City shall stimulate the local economy by providing port-of-call facilities to meet existing and future demand.

64. Most importantly, Goal 5A-4 requires intergovernmental cooperation. Operation of the Port of Key West must be coordinated with all entities having jurisdiction, including but not limited to Monroe County, the United State Navy, the United States Coast Guard, and the Federal and Florida Departments of Transportation.

65. The Florida Legislature, in recognizing the importance of Comprehensive Plans, specifically created a provision to prevent this exact situation from happening.

66. In providing for local municipal power and responsibility, the Legislature stated that "An initiative or referendum process in regard to any local comprehensive plan amendment or map amendment is prohibited unless it is expressly authorized by specific language in a local government charter that was lawful and in effect on June 1, 2011. A general local government charter provision for an initiative or referendum process is not sufficient." Fla. Stat. § 163.3167(8)(b).

67. The City's amendment process was put into place in 1998, and is a general charter provision without any specific language for amending the City's comprehensive plan. Attempting to get around the requirements of the comprehensive plan through a "general local government charter provision for an initiative" is barred by statute.

## Count I

### Declaratory Judgment pursuant to Title 46, United States Code

### The Three Initiatives Violate the Supremacy Clause and are Preempted by Federal Law

68. The allegations contained in Paragraphs 1 through 67 are incorporated by reference as if fully set our herein.

69. The cruise ships that are the subject of the Initiatives are federally-licensed vessels.

70. States and localities may not exclude from their water federally-licensed vessels.

71. A federal license implies, unequivocally, an authority for a licensed vessel to engage in the activity for which it is licensed.

72. The limitations imposed by the Initiatives conflict with federal law and are invalid under the Supremacy Clause.  US Const. Art. VI cl. 2.

73. The Initiatives are preempted by federal law and Title 46; the Initiatives are field preempted, and conflict preempted.

74. Conflict preemption occurs when there is language that precludes state regulation. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, (1978); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963).

75. The Initiatives violate the explicit language, and conflict with, multiple federal statutes under Title 46.  *See, e.g.,* 46 U.S.C. § 41106; 46 U.S.C. § 70021.

76. Field preemption occurs when federal regulation in a particular field is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. *United States v. Locke*, 529 U.S. 89, 108 (2000).

{00200804 - v6 }

77. The Initiatives violate the comprehensive regulatory scheme of the Title 46; in terms of the ship design, construction, port of call, operations, and passengers, and operation of vessels that is squarely within the purview of Title 46.

78. The Initiatives, as they are facially unconstitutional in their entirety, should be removed from the ballot prior to the election on November 3, 2020.

79. As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the parties as to whether above-referenced Initiatives are valid and constitutional and should be allowed on the November 3, 2020 ballot.

## Count II

### Declaratory Judgment pursuant to the Commerce Clause

### The Three Initiatives Violate the Commerce Clause and are Unconstitutional

80. The allegations contained in Paragraphs 1 through 67 are incorporated by reference as if fully set our herein.

81. "Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8. Cl, 3.

82. The cruise ship operations that are the subject of the Initiatives constitute interstate commerce as they primarily cater to out-of-state tourists and a large number of the cruise ship passengers are travelers from out-of-state.

83. The cruise ship operations that are the subject of the Initiatives constitute foreign commerce as the cruise ships all go to foreign ports of call on their itinerary along with the Port of Key West.

84. The Initiatives constitute a substantial burden on both interstate commerce and foreign commerce as the Initiatives will effectively end the cruise ship industry's operation in the City of Key West, which is home to one of the busiest ports in the nation.

85. Eliminating foreign commerce and eliminating or reducing the presence of out-of-state tourists is not a proper reason for a ban and contradicts the very purpose of the commerce clause.

86. The Initiatives, as they are facially unconstitutional in their entirety, should be removed from the ballot prior to the election on November 3, 2020.

87. As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the parties as to whether above-referenced Initiatives are valid and constitutional and should be allowed on the November 3, 2020 ballot.

## Count III

### Declaratory Judgment pursuant to State Preemption

### The Three Initiatives Violate the Comprehensive State Regulatory Scheme

88. The allegations contained in Paragraphs 1 through 67 are incorporated by reference as if fully set our herein.

89. Florida recognizes implied preemption; courts will strike down enactments that are inconsistent with state law when the Florida legislature has preempted a particular subject area. *D'Agostino v. City of Miami*, 220 So. 3d 410 (2017).

90. Here, the Florida Legislature enacted a comprehensive legislative scheme regarding Florida's ports to the limits of Florida's ability to regulate up to the federal regulatory scheme.

91. The Legislature has created its own system of recognized ports, including the Port of Key West, and a statutory scheme under Fla. Stat. Ch. 311 ("Seaport Programs and Facilities") for the creation, financing, and expansion of Florida's ports.

92. Seaport planning is a state-level activity, headed by the Department of Transportation and pursuant to a unified state plan. Fla. Stat. § 311.14.

93. The Initiatives violate the role of the comprehensive regulatory scheme devised by the state, and are preempted by state law.

94. The Initiatives, as they are facially unconstitutional in their entirety and preempted by state law, should be removed from the ballot prior to the election on November 3, 2020.

95. As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the parties as to whether above-referenced Initiatives are valid and constitutional and should be allowed on the November 3, 2020 ballot.

## Count IV

### Declaratory Judgment pursuant to Fla. Stat. § 163.3167(8)(b)

### The Three Initiatives Are An Unlawful Comprehensive Plan Amendment

96. The allegations contained in Paragraphs 1 through 67 are incorporated by reference as if fully set our herein.

97. The Comprehensive Plans of both Monroe County and Key West have sections dealing with the Port of Key West.

98. Any changes to the use of a deepwater port is a change to the Comprehensive Plan. A deepwater port is defined in the community planning act, Fla. Stat. 163.3164, and includes the Port of Key West.

99. Attempts to change any comprehensive plan through an initiative process, such as the Initiatives, is expressly barred by Fla. Stat. § 163.3167(8)(b).

100. The Initiatives, as they are facially barred by statute and improper in their entirety, should be removed from the ballot prior to the election on November 3, 2020.

101. As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the parties as to whether above-referenced Initiatives should be allowed on the November 3, 2020 ballot.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Key West Bar Pilots Association prays for a declaration that the Initiatives to add new sections to the Key West Charter, sections 1.09, 1.10, and 1.11, be declared unconstitutional and/or preempted by federal, state, and/or local law, and that R. Joyce Griffin, in her official capacity as Supervisor of Elections for Monroe County, Florida, be ordered to not place the Initiatives on the November 3, 2020 ballot, and for any other such relief the Court requires in the interest of justice between the parties.

Dated: July 7, 2020

Respectfully Submitted,

S M I T H / H A W K S
*Attorneys for Plaintiffs,*
KEY WEST BAR PILOTS ASSOCIATION
138 Simonton Street
Key West, Florida 33040
Telephone: (305) 296-7227
Facsimile: (305) 296-8448

{00200804 - v6 }

Primary: Bart@SmithHawks.com
Chris@SmithHawks.com
Ashley@SmithHawks.com
Nikki@SmithHawks.com

Secondary: Brandi@SmithHawks.com
Jen@SmithHawks.com

BY: /s/ *Barton W. Smith*

Barton W. Smith, Esq.
Florida Bar No. 20169

Christopher B. Deem, Esq.
Florida Bar No. 94462

Ashley N. Sybesma, Esq.
Florida Bar No. 22059

Nicola J. Pappas, Esq.
Florida Bar No. 126355