**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**KEY WEST CIVIL DIVISION**

**CASE NO.:  4:20-CV-10076-JLK**

**KEY WEST BAR PILOTS ASSOCIATION**
and **PIER B DEVELOPMENT CORP.,**
a Florida Corporation,

Plaintiff/Intervenor,

**v.**

**R. JOYCE GRIFFIN,** in her official capacity
as **SUPERVISOR OF ELECTIONS FOR
MONROE COUNTY, FLORIDA,** the **CITY
OF KEY WEST,** a municipal corporation of the
State of Florida, and **KEY WEST
COMMITTEE FOR SAFER CLEANER
SHIPS, INC.,** a Florida non-profit corporation

Defendants.

_____/

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**AND MEMORANDUM IN SUPPORT OF MOTION**

**I.**     **MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56, Federal Rules of Civil Procedure and Local Rule 56.1, the Key West

Bar Pilots Association and Plaintiff Intervenor Pier B Development Corp., move for summary

judgment declaring that the three proposed Key West City Charter Initiatives (the "Initiatives")

contravene federal constitutional law and Florida statutory law precluding their inclusion on the

forthcoming November election ballot.

The Amended Complaint (DE 6), the Intervenor Complaint (DE 31-4), and the Answer of

the Defendants' (DE 14, DE 29, DE 30, DE 35), establish the undisputed facts.  A separately filed

Statement of Material Facts ("SOF") sets forth the undisputed facts. Two of the Defendants have offered no affirmative defenses. The third Defendant, The Key West Committee for Safer Cleaner Ships, Inc., has offered affirmative defenses, none of which are legally sufficient to preclude summary judgment.

There are no "genuine issue[s] of material fact[s]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Summary judgment is appropriate. As we show below, the three Initiatives which seek to (1) limit the number of persons (passengers and crew) on all cruise ships docking in Key West; (2) limit the total number of persons (passengers and crew) who may daily disembark from all cruise ships docking in Key West; and (3) impose a hierarchy of environmental and health standards on cruise ships which have met all federal standards allowing them to engage in maritime commerce, are preempted by federal law. "[T]he Union was formed with the very definite design of freeing maritime commerce from intolerable restrictions incident to such [local] control." *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674-75 (1982).

The Initiatives also violate Florida law. Supplemental jurisdiction (28 U.S.C. §1367), provides the basis for the Court to strike these Initiatives from the ballot because they seek to alter the property rights guaranteed to the private property owner, Pier B, by a Development Order. Florida statutory and case law is clear that an individual's property rights are not subject to the will of the voters.[1] Florida statute section 163.3167(8)(a) provides that "[a]n initiative or referendum process in regard to any development order is prohibited." *Mullen v. Bal Harbor Village*, 241 So.3d 949, 956 (Fla. 3d DCA 2018) confirms that the statute prohibits any attempt to subject an individual's property rights to the will of the voters.

---

[1] As to the Intervenor, Pier B, the Initiatives can be struck without regard to the federal preemption arguments. As Pier B is the only privately owned of the three cruise ship docks in Key West, the constitutional issues must be addressed in order to provide complete relief.

The Supervisor of Elections should be precluded from placing the Initiatives on the ballot.

## II.   STANDARD FOR PRE-BALLOT CHALLENGE

On a pre-ballot challenge, this Court may only determine if challenged initiatives are (1) "facially constitutional" and (2) "within the powers of the enacting body." *Gaines v. City of Orlando*, 450 So. 2d 1174, 1178 (Fla. 5th DCA 1984). "The rationale of that rule [for pre-ballot challenges] is that this type of question (as opposed to a political question) may be determined in advance of the election in order to preclude or forestall the possible expenditure of funds in a useless act should the ordinance ultimately be held unconstitutional." *W. Palm Beach Ass'n of Firefighters, Local Union 727 v. Bd. of City Comm'rs of City of W. Palm Beach*, 448 So. 2d 1212, 1214 (Fla. 4th DCA 1984). In addition to facial unconstitutionality, "[o]ne impediment to constitutionally derived legislative powers of municipalities occurs when the municipality enacts ordinances which conflict with state law." *Id*. (*quoting City of Miami Beach v. Rocio Corp.*, 404 So. 2d 1066 (Fla. 3d DCA 1981)). The Initiatives here, facially, fail on both constitutional and state law grounds and, as we show below, are not fit to be on an election ballot.

## III.   MEMORANDUM OF LAW

### A.   The Laws of the United States Preempt the Initiatives

The laws of the United States "shall be supreme Law of the Land."[2] U.S. CONST., Art. VI. State or local laws that "interfere with, or are contrary to, federal laws" are invalid. *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 9 (1824); *see also Bailey v. Rocky Mountain Holdings, LLC,* 136 F. Supp. 1376,

---

[2] The Supremacy Clause is the Constitutional basis for the doctrine of federal preemption. *See Young v. Coloma-Agaran,* No. CIV. 00-00774HG-BMK, 2001 WL 1677259, at *4 (D. Haw. Dec. 27, 2001) (citing *Int'l Ass'n of Indep. Tank Owners (Intertanko) v. Locke*, 148 F.3d 1053, 1058-59 (9th Cir. 1998), *aff'd in part United States v. Locke*, 529 U.S. 89 (2000), and *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152 (1982)).

1379 (S.D. Fla. 2015), *aff'd*, 889 F.3d 1259 (11th Cir. 2018).  A substantial body of federal law controls and regulates the operations of cruise vessels serving the interstate and foreign commerce of the United States.  These vessels are subject to federal inspection and supervision in a variety of areas, including construction standards, environmental protection requirements, operational procedures, security measures, and health and safety requirements.

There is a federal national interest in maritime commerce that can only ". . . be fully vindicated if all operators of vessels on navigable waters are subject to uniform rules of conduct." *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 674-75 (1982).  The necessity of uniformity of regulation and standards is obvious:

> The confusion and difficulty, if vessels were compelled to comply with the local statutes at every port, are not difficult to see.  Of course, <u>some within the states might prefer local rules; but the Union was formed with the very definite design of freeing maritime commerce from intolerable restrictions incident to such control</u>.  The subject is national.  <u>Local interests must yield to the common welfare.</u>  The Constitution is supreme.[3]

This Court has recognized that "there are three types of preemption: express preemption, field preemption, and conflict preemption."  *In re Checking Account Overdraft Litig.,* 880 F. Supp. 2d 1290, 1295 (S.D. Fla. 2012) (King, J.)  (citing *Baptista v. JPMorgan Chase Bank, N.A.* 640 F.3d 1194, 1197 (11th Cir. 2011).  "Express preemption occurs where federal law expressly so provides."  *Id.* (citing *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 604-05 (1991).  "Field preemption occurs where federal law implies an intent to supersede state law in a given area."  *Id*. (internal quotation marks omitted).  "Conflict preemption occurs where federal and state law actually conflict, whether because state law makes compliance with federal law impossible or because state law stands as an obstacle to the accomplishment and execution of federal purposes."

---

[3] *State of Washington v. W.C. Dawson & Co.,* 264 U.S. 219 (1924). (emphasis supplied).

*Id.* (internal quotation marks omitted). This Court has observed that "regulations, not just statutes, may preempt state law." *Id.* (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less preemptive effect than federal statutes.").

**1.   Courts Have Consistently Held That Federal Maritime Laws & Regulations Preempt Conflicting State & Local Laws**

The Constitution and a wide array of federal statutes recognize the primacy and virtual exclusivity of federal, as opposed to state and local, authority over maritime activities. *See United States v. Locke*, 529 U.S. 89, 108 (2000) ("Congress has legislated in the field from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme."). In maritime law, there is "a history of significant federal presence" and, thus, "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers." *Id.* Rather, the issue is "whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives a uniformity of regulation for maritime commerce." *Id.*

*Locke* addressed the issue of whether laws regulating oil tankers adopted by the state of Washington could stand despite the "comprehensive federal regulatory scheme governing oil tankers." *Id.* at 94. Failure to comply with the Washington rules exposed vessel operators to sanctions, which included "statutory penalties, restrictions of the vessel's operations in state waters, and a denial of entry into state waters." *Id.*

"The authority of Congress to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations, was cited in the Federalist Papers as one of the reasons for adopting the Constitution." *Id.* (citing Federalist Nos. 44, 12, 64). "In 1789, the First Congress enacted a law by which vessels with a federal certificate were entitled to 'the benefits granted by any law of the United States.'" *Id.* (citing Act

of Sept. 1, 1789, Ch. 11, § 1, 1 Stat. 55).  The emergence of maritime transport by steamship "resulted in further federal licensing requirements enacted…to enhance the safety of crew members and passengers."  *Id.* (citing Act of July 7, 1838, Ch. 191, 5 Stat. 304; Act of Mar. 3, 1843, Ch. 94, 5 Stat. 626).  "In 1871, Congress enacted a comprehensive scheme of regulation for steam powered vessels, including provisions for licensing captains, chief mates, engineers, and pilots." *Id.* (citing Act of Feb. 28, 1871, Ch. 100, 16 Stat. 440).  *Locke* found state-level disruption of a comprehensive federal maritime interest to be constitutionally repugnant, and a municipal effort to restrict interstate and foreign maritime commerce is even more incompatible with a uniform federal system.

Where Congress has acted, the Supreme Court has had "little difficulty in finding state vessel requirements were preempted by federal laws which governed the certification of vessels and standards of operation."  *Id.* at 100.  The Supreme Court has held that the federal license held by a vessel contained "the only guards and restraints, which Congress has seen fit to annex to the privileges of ships and vessels engaging in the coasting trade."  *Id.* at 100 (citing *Sinnot v. Davenport*, 22 How. 227, 241) (1859).  In such a circumstance, "state laws on the subject must yield: 'in every such case, the act of Congress or treaty is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it.'"  *Id.* (citing *Sinnot*, 22 How. at 243).

In *Locke,* the Court held that the State's regulations were preempted by federal statutes and regulations pertaining to oil tankers.  *Id.* at 113-117.  Part of the analysis is one of "conflict preemption," which occurs "when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Id.* at 109 (citing *California v. ARC America Corp.,* 490 U.S. 93, 100-101 (1989)).  Specifically, "Coast Guard regulations are to be given preemptive effect over

conflicting state laws." *Id.* at 109-110 (citing *City of New York v. FCC*, 486 U.S. 57, 63-63 (1988) ("'[A] federal agency acting within the scope of its congressionally delegated authority may preempt state regulation' and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law.").   The relevant inquiry is "whether the Coast Guard has promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all." *Id.* at 110 (citing *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 171-172 ("'[W]here failure of…federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation." (internal citation omitted).  In addition, "even in the context of a regulation related to local waters, a federal official with an overview of all possible ramifications of a particular requirement might be in the best position to balance all the competing interests." *Id.* (citing *Ray*, 435 U.S. at 177). "[T]he Supremacy Clause dictates that the federal judgment that a vessel is safe to navigate United States waters prevail over the contrary state judgment."  (citing *Ray,* 435 U.S. at 165).

### 2.    Cruise Vessels Are Subject to an Extensive Federal Regulatory Regime

The extensive federal role in the design, operations, construction, navigation, manning and equipment of oil tankers as discussed in *Locke* is mirrored in federal and international regulation of cruise vessels, where there is "a history of significant federal presence." *Locke*, 529 U.S. at 108.  Accordingly, as in *Locke*, "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers." *Id.*  Rather, the issue is "whether the local laws in question are consistent with the federal statutory structure." *Id.*  As discussed below, the proposed Key West regulations are not consistent with the federal statutory structure and cannot stand under the Supremacy Clause.

### a.    *Coast Guard Regulations*

The federal government, through the Coast Guard and other federal agencies, routinely prescribes practices, procedures, and standards for vessel operations and, in the interests of safety, health, environmental protection, and maritime and national security, directs where vessels may, and may not, operate or anchor. *See* 46 C.F.R. Subchapter H. The Coast Guard regulations "are necessary to carry out the provisions of law affecting passenger regulations and such regulations have the force of law." 46 C.F.R. § 70.01-1. These regulations "have preemptive effect over State or local regulations in the same field." *Id.*

Foreign vessels which are "of a foreign nation signatory to the International Convention for Safety of Life at Sea, 1974, and *which has on board a current valid safety certificate*" or vessels that are "of a foreign nation having *inspection laws issued by its government approximating those of the United States together with reciprocal inspection arrangements with the United States, and which has on board a current valid certificate of inspection issued by its government* under such arrangements" (46 C.F.R. §70.05-3(b) (emphasis supplied)) underscore the foreign commerce elements of safety and the need for uniformity under the Supremacy Clause.

The Coast Guard regulations found in 46 C.F.R. Subchapter H contain requirements for the inspection and certification of passenger vessels[4] (Part 71), construction and arrangement (Part 72), fire protection equipment (Part 76), vessel control and miscellaneous systems and equipment (Part 77), operations (Part 78), and disclosures of safety standards and country of origin (Part 80). Included amongst the regulations are requirements for passenger vessels to display a valid certificate of inspection. 46 C.F.R. § 71.01-5. No vessel subject to Coast Guard inspection and certification can be operated without a valid certificate of inspection. 46 C.F.R. § 71.01-2.

---

[4] "Passenger vessels" includes those ships referred to as "cruise ships" and "cruise vessels." *See* 46 C.F.R. § 70.10-1 (defining passenger vessels). "Vessel" also includes those ships referred to as "cruise ships" and "cruise vessels." *Id.*

Certificates of inspection "may be revoked or suspended by the *Coast Guard* where such process is authorized by law." 46 C.F.R. § 71.01-10. (emphasis supplied). As noted above, the regulations in Part 71, and indeed all of Subchapter H, have preemptive effect over State or local regulations.

> **b.      *The Federal Regulatory Regime Includes Other Federal Agencies***

The extensive, sophisticated federal regulatory regime is not limited to the Coast Guard. Other federal agencies, such as the Center for Disease Control and Prevention ("CDC"), Environmental Protection Agency ("EPA"), and Federal Maritime Commission ("FMC") all regulate aspects of the passenger cruise line industry. For example, the CDC oversees the Vessel Sanitation Program ("VSP"), which subjects vessels to undergo two unannounced health inspections per year. The VSP inspections cover medical facilities, potable water systems, swimming pools and whirlpool spas, galleys and dining rooms, child activity centers, hotel accommodations, ventilation systems, and common areas. *See* 42 U.S.C. Section 264 Quarantine and Inspection Regulations to Control Communicable Disease; *see also* https://www.cdc.gov/nceh/vsp/default.htm. The FMC administers financial responsibility requirements that ensure passengers can recover for losses caused by casualties or failures to perform cruise undertakings. *See* 46 C.F.R. § 540.

In recent times, the CDC was one of the primary agencies leading the federal government's response to the COVID-19 crisis. The CDC's *Second Modification and Extension of No Sail Order and Other Measures Related to Operations*, issued July 16, 2020, makes clear that the federal government, not state or local governments, issues "controlled free pratique"[5] in international, interstate, or intrastate waterways subject to the jurisdiction of the United States. The Order states:

---

[5] 42 C.F.R. § 71.1(b) defines "controlled free pratique" as "permission for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated conditions."

1. Cruise ship operators shall continue to suspend passenger operations and not embark passengers, except as approved by *HHS/CDC personnel and USCG*, in consultation with other *federal* authorities as appropriate.  (emphasis supplied)

2. As a condition of obtaining or retaining controlled free pratique to operate in any international, interstate, or intrastate waterways subject to the jurisdiction of the United States, cruise ship operators shall continue to follow CDC's *Interim Guidance for Mitigation of COVID-19 Among Cruise Ship Crew During the Period of the No Sail Order*, including reporting to HHS/CDC through weekly submission of the Enhanced Data Collection (EDC) form, as may be updated.  Additionally, cruise ship operators shall report to USCG via Advance Notice of Vessel Arrival (ANOA), whenever in U.S. waters.

3. As a condition of obtaining or retaining controlled free pratique to operate in any international, interstate, or intrastate waterways subject to the jurisdiction of the United States, cruise ship operators with appropriate NSO response plans shall continue to follow the *COVID-19 Color Coding System* requiring preventive measures for crew onboard based on the ships' status, as determined by HHS/CDC.

4. As a condition of obtaining or retaining controlled free pratique to operate in any international, interstate, or intrastate waterways subject to the jurisdiction of the United States, cruise ship operators with appropriate NSO response plans shall conduct viral testing for COVID-19 for crew in such a manner as described in the relevant CDC guidance with reporting of results in the EDC form.

*See Second Modification and Extension of No Sail Order and Other Measures Related to Operations*, available at: https://www.cdc.gov/quarantine/pdf/No-Sail-Order-Cruise-Ships-Second-Extension_07_16_2020-p.pdf.

This extensive federal statutory and regulatory regime consists of detailed regulations from the Coast Guard, CDC, FMC, and EPA that make clear that permission for a carrier to enter a U.S. port, disembark, and begin operation, and the power to revoke such permission, lies solely with the federal government.  "Congress did not anticipate that a vessel found to be in compliance with the Secretary's design and construction regulations and holding a Secretary's permit, or its equivalent…would nevertheless be barred by state law from operating in the navigable waters of the United States…" *Ray*, 435 U.S. at 163-164.  Like the extensive federal statutory and regulatory regime in *Locke*, these federal laws and regulations are subject to conflict preemption and "are to be given preemptive effect over conflicting state laws" and field preemption "because they are

within a field reserved for federal regulation" and "Congress has left no room for state regulation of these matters." *Locke*, 529 U.S. at 109-111.

### c. *Treaties and International Agreements*

The cruise vessel industry is inherently international, involving vessels registered in many nations trading in complex itineraries to all parts of the world. The cruise ships which dock in Key West were 100% foreign flag vessels in 2019. (SOF ¶ 39). In addition to the U.S. federal statutory and regulatory requirements discussed above, the "scheme of regulation includes a significant and intricate complex of international treaties and maritime agreements bearing upon the licensing and operation of vessels." *Id.* at 102. The international regime "depends upon the principle of reciprocity…[t]hat is to say, the certification of a vessel by the government of its own flag nation warrants that the ship has complied with international standards, and vessels with those certificates may enter ports of the signatory nations." *Id.*; *see also* 46 U.S.C. § 3303. A key structural component of the network of maritime treaties and conventions to which the United States is a party is the notion of reciprocity – signatory nations, including the United States, accept compliance by another nation as satisfying conditions for port entry. The Supremacy Clause dictates that a disparate state law "must yield when it is inconsistent with, or impairs the policy or provisions of, a treaty or of an international compact or agreement." *United States v. Pink*, 315 U.S. 203, 231 (1942). When the national government has exercised its indisputable foreign affairs powers to commit the Nation to vessel standards agreed to by various maritime countries, it is constitutionally abhorrent that a municipality would seek to restrict the operation of a vessel that the federal government has pledged to accept in U.S. ports.

Treaties to which the United States is a party are the International Convention for the Safety of Life at Sea, 1974, 32 U.S.T. 47, T.I.A.S, No. 9700, the International Convention for Prevention of Pollution from Ships, 1973, S. Exex. Doc. C, 93-1, 12 I.L.M. 1319, as amended by 1978

Protocol, S. Exec. Doc. C., 96-1, 17 I.L.M. 546, and the International Convention of Standards of Training, Certification and Watchkeeping for Seafarers, With Annex, 978 (STCW), S. Exex. Doc. EE-96-1, C.T.I.A. No. 7624.  *Id.*  These conventions, established under the auspices of the International Maritime Organization (IMO), bind signatory maritime nations to minimum standards for vessels flying their own flag, but also impose the sole enforceable standards that each party may impose on the vessels of other signatory nations' flags.  It is into this complex environment of diplomacy and exercise of the foreign affairs powers of the United States that the proposed Initiatives now seek to intrude.

*Locke* did not find it necessary to reach the question of whether the network of maritime treaties to which the United States is a party have, *ex proprio vigore,* preemptive force because it found the challenged state regulations were preempted by federal statute and regulations.  529 US at 103.  However, the Court did find that "[t]he existence of the treaties and agreements on standards of shipping is of relevance, of course, for these agreements give force to the longstanding rule that the enactment of a uniform federal scheme displaces state law ,and the treaties indicate Congress will have demanded national uniformity regarding maritime commerce."  *Id.*

### B.   The Key West Proposals Would Ban Federally-Licensed, Permitted or Regulated Vessels from the Port of Key West

A state ban on port calls by a federally-licensed, permitted, or regulated vessel constitutes a clear violation of the Supremacy Clause.  *See Young v. Coloma-Agaran*, 340 F.3d 1053, 1057 (9th Cir. 2003) (concluding that a state law precluding tour boat operators from operating their vessels in a particular bay in Hawaii was preempted because "the ban completely excludes the plaintiffs from conducting their federally-licensed, permitted, or regulated tour boat business in Hanalei Bay.").

The Key West proposals would ban federally-licensed, permitted, or regulated cruise ships from the Port of Key West.  In commenting on the importance of ports to the cruise line industry, the Eleventh Circuit has observed that:

> Ports-of-call not only add to the enjoyment of a cruise but form an essential function of the cruise experience…[p]lainly, individuals choose cruise ship vacations because they want to visit unfamiliar places ashore.  Cruises…offer fundamentally different experiences, not generally because of any material difference between ships, but often because of where the ships elect to *stop*.  *See Isham v. Pacific Far East Line, Inc.,* 476 F.2d 835, 837 (9th Cir.1973) ("Where a passenger or cruise vessel puts into numerous ports in the course of a cruise, these stopovers are the sine qua non of the cruise.").  When a passenger selects a particular cruise, ports-of-call or stopovers provide those passengers with the "cruise experience" for which they are paying.  Simply put, the destinations or ports-of-call are frequently the main attraction.

*Doe v. Celebrity Cruises, Inc*., 394 F.3d 891, 901 (11th Cir. 2004) (emphasis in original).

The challenged Initiatives include both an outright ban on passenger disembarkations from vessels that exceed a combined (passengers and crew) capacity of 1,300, and an upper limit on daily disembarkations of 1,500.  Using the projected 2021 Key West Port Calendar, plaintiffs calculate that these proposals would, if enacted, prevent 428 of the planned 455 port calls of cruise ships.  Those banned port calls represent 94% of total planned cruise ship visits to Key West and approximately 1.1 million cruise ship passengers.  (SOF ¶ 34).  Imposition of the daily 1,500 passenger disembarkation limit would reduce 2021 daily disembarkation levels from approximately 1.1 million annual visitors to 13,404.  (SOF ¶ 37).

Put another way, the Key West proposals ban 94-98% of federally-authorized cruise ship visits to Key West in 2021, 2022, and 2023, and results in approximately 1 million passengers turned away each year.  (SOF ¶¶ 34-37).  As in *Young*, such a ban "completely excludes the plaintiffs from conducting their federally-licensed" business and cannot stand under the Supremacy Clause.  *See Young*, 340 F.3d at 1057.  The bans and limits on passenger disembarkations are functionally indistinguishable from a ban on entering a port.  No cruise

vessel will call at a port where passengers cannot leave the ship.  Moreover, a very low upper limit on daily passenger disembarkations would essentially permit the first vessel to arrive each day to discharge a portion of its passenger complement, but render pointless any further vessel calls. Scheduling of the arrival of multiple cruise ships would become an exercise in futility.

The Initiatives, if enacted, would express a decision by the City to wall itself off from the maritime commerce of the United States.  The vast majority of cruise vessels meeting all applicable standards imposed by the United States and entitled to land passengers at other ports around the country would be prohibited from calling at Key West.  Cruise itineraries are complex.  This element of the interstate and foreign commerce of the United States would collapse if every port were to impose separate physical limitations on the capacities and activities of vessels that had met all international and federal standards for operation in the waters of the United States.

**C.    The Initiatives Impose a Local Restriction in Violation of the Commerce Clause**

"The Congress shall have power to . . . regulate commerce with foreign nations, and among the several states, and with the Indian tribes."  Art. I, § 8, cl. 3.  The federal government has imposed an extensive, complex, and technically demanding regulatory regime governing the operation of ocean vessels serving the commerce of the United States.  This regulatory structure includes the passenger vessels that are the subjects of the Initiatives.  Federal statutes, regulations, and case law discussed above demonstrate the federal government's interest in regulating maritime commerce at a national level because of a need for uniformity.  The need for the uniformity and consistency in the regulation of commerce with foreign nations and between states was recognized by the Supreme Court as far back as *Gibbons v. Ogden*, 22 U.S. 1, 74 (1824) ("The power over commerce, including navigation, was one of the primary objects for which the people of America adopted their government. . . ."); *see also Cooley v. Bd. of Wardens of Port of Philadelphia*, 53

U.S. 299, 319 (1851), *abrogated by Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995) ("Whatever subjects of this [Commerce] power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress").   The Supreme Court has described the federal government's power over foreign commerce as "exclusive and absolute", *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904), and impinging on "sensitive matters of foreign relations and national sovereignty." *Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 456 (1979).   Congress' exercise of power over foreign commerce "may not be limited, qualified, or impeded to any extent by state action." *Bd. of Trustees*, 289 U.S. at 56-57.   "A regulation which imposes onerous, perhaps impossible conditions on those engaged in active commerce with foreign nations, must of necessity be national in its character . . . .  it may properly be called *international*."   *Henderson v. Mayor of City of New York*, 92 U.S. 259, 273 (1875) (emphasis in original).

Every cruise journey involves advanced planning for complex vessel itineraries, the interstate and foreign travel of passengers not only aboard the vessel but in various conveyances on which they travel to and from the ship, requires long-term coordination for procuring provisions and supplies, all of which move in the interstate and foreign commerce of the United States.[6] The level of international and interstate coordination required for the cruise industry is exactly the kind of commerce that requires uniformity.   *E.g.*, *Pittston Warehouse Corp. v. City of Rochester*, 528 F. Supp. 653, 660 (striking down city law seeking to "block the free flow of interstate and foreign commerce by prohibiting the port to be used for commercial interstate and international shipping activities").

---

[6] *E.g.*, "Behind the Scenes on the High Seas: Cruise Ship Logistics," now that's logistics, April 11, 2016, available at https://nowthatslogistics.com/behind-the-scenes-on-the-high-seas-cruise-ship-logistics/ (last visited July 30, 2020).

The Initiatives, if enacted, would essentially place Key West off-limits to cruise vessel calls and disrupt the flow of foreign and interstate commerce. The Initiatives would impose on cruise vessels a design requirement limiting their total passenger and crew capacity to 1,300 persons. They would extinguish passenger disembarkations once the daily total for all cruise vessels in Key West reached 1,500 passengers, a small fraction of the 2019 disembarkations in the port. And, finally, the challenged Questions would subject cruise vessels and cruise lines to the grant by the City of "preferences and priority" based on malleable references to federal environmental and health standards. (SOF ¶ 27).

These proposed rules would: (1) prescribe arbitrary limitations on foreign commerce coming into Key West, (2) disrupt the operations of domestic and foreign corporations doing business in Key West, (3) prevent foreign and interstate travelers on international vessels from disembarking at Key West, and (4) severely diminish Key West pilots' ability to provide valuable services to instrumentalities of interstate and foreign commerce. The City, alone, does not have the authority to make such rules. *Pittston Warehouse*, 528 F. Supp. at 660-61 ("Whether the river may be used for recreational as opposed to commercial shipping operations is not a decision which the City Council may determine singlehandedly. As a navigable waterway, the river is deemed the public property of the nation, and subject to all the requisite legislation by Congress."). For one port to set up a wall around itself forbidding commerce from 98% of cruise ships active in foreign commerce is exactly the kind of local obstruction of commerce that the Founders sought to avoid by empowering Congress to regulate commerce. "The Commerce Clause was designed to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 92 (1984) (internal quotations omitted). "Unrepresented interests will often bear the brunt of regulations imposed by one State having a significant effect

on persons or operations in other States. Thus, when the regulation is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state." *Id.* at 92-93.

In *Henderson v. Mayor of City of New York*, 92 U.S. 259 (1875), the Supreme Court struck down an attempt by New York state to require a surety for passengers arriving in New York from foreign countries. The Court found that the state statute would impinge on the international transportation of passengers, foreign commerce that was committed to Congress. "The laws which govern the right to land passengers in the United States from other countries ought to be the same in New York, Boston, New Orleans, and San Francisco." *Henderson*, 92 U.S. at 273. Similarly, in *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875), the Supreme Court struck down a California law requiring an examination of passengers arriving from foreign countries upon landing. Upon examination, an immigration commissioner would, in his sole discretion, determine whether each person was likely to become a public charge and, if so, would require a large bond for that person to alight from the ship. 92 U.S. at 278-81.

The Initiatives would render the rules for landing passengers in Key West different than those in other deep-water ports in the U.S. Like the laws that were struck down in *Henderson* and *Chy Lung*, the City may not impose restrictions which interfere with protected commerce.

## D.    The Initiatives Restrict Private Property Rights in Violation of Fla. Stat. § 163.3167(8) in Derogation of the Express Language of the Statute

Intervenor Pier B Development Corporation owns and operates the Pier B dock pursuant to a Development Order promulgated and agreed to by the Pier B Development Corporation in 1994. (SOF ¶¶ 12, 13). That Development Order provides for the structure and use of the land in order to achieve its maximum use as a cruise ship dock. The Initiatives interfere with, are

inconsistent with, and dramatically change the operation of Pier B as it was designed to guarantee that the dock's operation would be unencumbered by subsequent alterations.

Initiatives 1 and 2 seek to: (1) limit the number of persons disembarking from cruise ships to a total of 1,500 persons per day at any public or privately owned or leased property in Key West and (2) prohibit cruise ships with the capacity to carry 1,300 or more persons from disembarking any persons at any public or privately owned or leased property in Key West.  Initiative 3 seeks to provide unfettered discretion to the City (without articulating who or how) to offer preferences and priorities despite the fact that all cruise ships which dock in Key West are federally licensed, permitted, or regulated.  The three docking facilities at the Port of Key West that are the subject of the Amendments are located on three separate parcels of land; the City-owned Mallory Square, the Navy's Outer Mole, and the privately-owned Pier B.  (SOF ¶ 30).

A "'[d]evelopment order' means any order granting, denying, or granting with conditions an application for a development permit."  Fla. Stat. § 163.3164.  A "[d]evelopment permit" includes any "official action of local government having the effect of permitting the development of land."  Fla. Stat. 163.3184(14) Fla. Stat. 163.3184(16).  The Florida Legislature has defined "development" to include "the making of any <u>material change in the use</u> or appearance <u>of any structure or land</u>[.]"  Fla. Stat. 163.3184(14) *citing* Fla. Stat. 380.04(1).  (emphasis supplied).

Any official action of a local government, such as an amendment to a municipal charter that makes a material change in the use of any structure of land, is not allowed.  As such, Questions 1 and 2 the use of property, and are therefore prohibited by law.  "<u>An initiative or referendum process *in regard* to any development order is prohibited</u>."  Fla. Stat. § 163.3167(8)(a)(emphasis and underline supplied).

The statutory language leaves does not allow Questions 1 and 2 to place restrictions on the use of private property, and Question 3 opens the door to restrictions and requirements on Pier B

via City action.  The prior development orders issued by the City of Key West govern the regulation and use of Pier B's land.  They cannot be changed by an initiative or referendum. The Third District Court of Appeal has left no doubt that any attempt to do so is illegal and must be stricken:

> [t]he legislative prohibition in section 163.3167(8)(a) tackles the issue of whether an individual's property rights may be subject to the will of the voters.  In resolving this issue in favor of the property owner, the Legislature established consistency with land use law that confers due process rights on property owners through a quasi-judicial process.  *See Preserve Palm Beach Political Action Comm. v. Town of Palm Beach*, 50 So.3d 1176, 1179 (Fla. 4th DCA 2011).  The quasi-judicial process for site-specific development orders has become an unassailable principle of the process of property development in Florida.  *See Bd. of Cty. Comm'rs of Brevard Cty. v. Snyder*, 627 So.2d 469, 474–75 (Fla. 1993).

*Mullen v. Bal Harbour Vill.,* 241 So. 3d 949, 956 (Fla. 3d DCA 2018).  Municipal initiatives and referendums, such as the ones here, that attempt to bypass the quasi-judicial process set up by the Florida Legislature constitute "illegal referendum[s]."  *Id*. at 958.  The Florida legislature prohibited this type of municipal initiative in 2011; the City cannot have an unlawful election on a measure that the Florida Legislature clearly and unambiguously barred.  *Id*. at 956.

On December 8, 1986, the State of Florida and the City of Key West entered into a development agreement with the then-owner of the location named the "Truman Annex" and subsequently issued a DRI Development Order for the Truman Annex Development of Regional Impact (the "Truman Annex DRI") to develop the privately-owned Pier B to accommodate cruise ship tourism.  *See* Agreement For the Built-Out Truman Annex DRI, DE 31-1.  The Truman Annex DRI was subsequently amended twelve times leading to an Agreement for Build Out, Resolution 99-457, a development order authorized under Fla. Stat. § 380.06.  DE 31-2 ("Agreement for Vuild Out").

In the Agreement for Build Out, the City, the state of Florida (through the Florida Department of Community Affairs) and the property owner agreed to additional conditions for a

build out, including the development of Pier B and its use which is incorporated into the Agreement

for Build Out through the Declaration of Covenants, Conditions, and Restrictions for Pier B at

Truman Annex, Resolution 93-405, paragraph 2 which provides as follows:

> The Declarant will immediately begin construction . . . to Pier B to allow its use as
> a cruise port facility . . . to accommodate cruise ship passengers . . . 3.  The
> Declarant shall use its best efforts to solicit and book cruise ships so as to maximize
> disembarkation fee revenue . . . 7.  The covenants, conditions and restrictions of the
> Declaration shall run with and bind Pier B, shall be enforceable against the
> Declarant or its successors in title to Pier B for a term of twenty-one (21) years
> from the date hereof, after which time this Declaration shall automatically extend
> for successive periods of ten (10) years unless an instrument signed by the
> Declarant or its successors in title to Pier B and the City has been recorded in the
> Public Records of Monroe County, Florida agreeing to terminate this Declaration,
> in whole or in part.

The development process for Pier B went through the proper quasi-judicial process with the City

for approval, and cannot be undermined through public initiatives.  *See Mullen*, 241 So. 3d at 956.

The quasi-judicial process for site-specific development orders has become an unassailable

principle of the process of property development in Florida.  *Id.*  The initiative process seeking to

enact the three amendments to the Charter of the City of Key West are in regard to, and directly

affect, the Pier B Development Order and the accompanying Resolution.  Initiatives which are in

contravention of state law, are not permitted to be considered by voters. *Id.* at 957.

### E.  CONCLUSION

For the reasons set forth above, summary judgment should be entered in favor of the

Plaintiffs on all counts of the Complaint.

Dated:  August 3, 2020.                              Respectfully Submitted,

*Counsel for Plaintiff,*
*KEY WEST BAR PILOTS ASSOCIATION,*
and
*Counsel for Plaintiff/Intervenor,*
*PIER B DEVELOPMENT CORP.,*

**S M I T H / H A W K S**

138 Simonton Street
Key West, Florida 33040
Telephone:  (305) 296-7227

Primary:          Bart@SmithHawks.com
                        Chris@SmithHawks.com
                        Ashley@SmithHawks.com
                        Nikki@SmithHawks.com

Secondary:     Brandi@SmithHawks.com
                        Jen@SmithHawks.com

BY:   /s/ *Barton W. Smith*

    BARTON W. SMITH, ESQ.
    Florida Bar No. 20169

    CHRISTOPHER B. DEEM, ESQ.
    Florida Bar No. 94462

    ASHLEY N. SYBESMA, ESQ.
    Florida Bar No.  22059

    NICOLA J. PAPPAS, ESQ.
    Florida Bar No. 126355

*AND*

**BRUCE S. ROGOW, P.A**.
100 N.E. Third Ave., Ste. 1000
Fort Lauderdale, FL 33301
Telephone:  (954) 767-8909
Primary:     BRogow@RogowLaw.com
                      Tcampion@rogowlaw.com

    BRUCE S. ROGOW, ESQ.
    Fla. Bar No. 067999

    TARA A. CAMPION, ESQ.
    Fla. Bar No. 90944

*AND*

**THOMPSON COBURN, LLP**
1909 K Street, N.W., Suite 600
Washington, D.C. 20006
Telephone: (202) 585-6985
Primary:     jbenner@thompsoncoburn.com

    JONATHAN BENNER, ESQ.
    pro hac vice